**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| SHADIYA MINOR RAYQUAN MINOR, and SEMAJ SWEEZER,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF CHICAGO; SERGEANT ERICK SENG; OFFICER RICHARD RODRIGUEZ, JR.; OFFICER JOSEPH VECCHIO; and OFFICER CRYSTINA KITTRELL,<br><br>Defendants. | Case No. ______________________<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiffs Shadiya Minor, Rayquan Minor, and Semaj Sweezer, by their attorney, complain of Defendants as follows.

## INTRODUCTION

1. This is a civil rights action brought by three members of the Jesse White Tumbling Team who were subjected to a racially motivated traffic stop.

2. On August 10, 2024, four Chicago police officers curbed the car in which Plaintiffs were riding home, in uniform, from performing in the Bud Billiken Parade.

3. Defendants had no warrant, no probable cause, and no reasonable suspicion. Defendants then searched Plaintiffs, their vehicle, and their belongings, and handcuffed one of them, without justification.

4. Plaintiffs sue under 42 U.S.C. § 1983, the Fourth and Fourteenth Amendments, and the Illinois Civil Rights Act, against the four officers and against the City of Chicago, whose policies, practices, and customs caused Plaintiffs' injuries.

## JURISDICTION AND VENUE

5. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3)–(4).

6. This Court has supplemental jurisdiction over Plaintiffs’ state-law claims under 28 U.S.C. § 1367(a).

7. Venue is proper in this District under 28 U.S.C. § 1391(b). The events at issue occurred in Chicago, Cook County, Illinois, and all Defendants reside in this District.

## PARTIES

8. Plaintiff Shadiya Minor is a Black woman who resides in Chicago, Illinois. She was the front-seat passenger in the vehicle. She is a member of the Jesse White Tumbling Team, with which she has performed for approximately fourteen years.

9. Plaintiff Rayquan Minor is a Black man who resides in Chicago, Illinois. He was the driver of the vehicle. He holds a valid Illinois Firearm Owner's Identification Card and a valid Illinois Concealed Carry License. He is a member of the Jesse White Tumbling Team, with which he has performed for approximately three years.

10. Plaintiff Semaj Sweezer is a Black man who resides in Chicago, Illinois. He was the back-seat passenger in the vehicle. He holds a valid Illinois Firearm Owner's Identification Card and a valid Illinois Concealed Carry License. He is a performer and a coach for the Jesse White Tumbling Team, with which he has performed for approximately twenty years.

11. Defendant SERGEANT ERICK SENG, Star No. 2677, was at all relevant times a Chicago police sergeant acting under color of law and within the scope of his employment. He was the ranking officer present and supervised the other individual Defendants during the events alleged. He is sued in his individual capacity.

12. Defendant OFFICER RICHARD RODRIGUEZ, JR., Star No. 12157, was at all relevant times a Chicago police officer acting under color of law and within the scope of his employment. He is sued in his individual capacity.

13. Defendant OFFICER JOSEPH VECCHIO, Star No. 14469, was at all relevant times a Chicago police officer acting under color of law and within the scope of his employment. He is sued in his individual capacity.

14. Defendant OFFICER CRYSTINA KITTRELL, Star No. 10313, was at all relevant times a Chicago police officer acting under color of law and within the scope of her employment. She is sued in her individual capacity.

15. Defendant CITY OF CHICAGO is an Illinois municipal corporation. It operates, funds, staffs, trains, supervises, and disciplines the Chicago Police Department, and it employed each individual Defendant. It is liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), is liable as principal for the state-law torts of its agents, and is obligated to indemnify its employees under 745 ILCS 10/9-102.

## FACTS

### *A. Plaintiffs are Jesse White Tumblers.*

16. All three Plaintiffs are members of the Jesse White Tumbling Team.

17. The Jesse White Tumbling Team is a Chicago institution. Jesse White founded it in 1959, when he was twenty-five years old and teaching elementary school, after he was asked to put on a gymnastics show for the children of the Rockwell Gardens public housing development in East Garfield Park.[1]

18. Its founder went on to serve sixteen years in the Illinois House of Representatives, six years as Cook County Recorder of Deeds, and twenty-four years as Secretary of State of Illinois, from 1999 until 2023 — the first Black person and the longest-serving person ever to hold that office.

---

[1] The Jesse White Tumbling Team, *About*, https://jessewhitetumblingteam.com/about/.

19. White built the team as a delinquency prevention program. Its purpose, from the first day, was to give Black children growing up in Chicago public housing something to belong to other than the street.

20. More than eighteen thousand young Chicagoans have come through the program in the sixty-five years since. Its alumni have become teachers, business owners, service members, first responders, and public servants.

22. The team's members are acrobats. They tumble and somersault off mats and trampolines, over one another and over twelve-foot banners, in the team's red and white uniforms.

23. They perform more than 1,500 times a year — at parades, at schools, at civic events, and at halftime — throughout Chicago, throughout the surrounding suburbs, across the country, and abroad. Team members have performed at halftime for nearly every club in the National Basketball Association and have marched in two presidential inaugural parades.

24. Semaj Sweezer is a performer and a coach for the team. He has been a Jesse White Tumbler for approximately twenty years.

25. Shadiya Minor has been a Jesse White Tumbler for approximately fourteen years.

26. Rayquan Minor has been a Jesse White Tumbler for approximately three years.

***B. Plaintiffs spent August 10, 2024 performing, and Defendants stopped them on the way home.***

27. August 10, 2024 was the day of the Bud Billiken Parade — the back-to-school parade held on Chicago's South Side every August since 1929, and the largest African American parade in the United States.[2]

28. Plaintiffs performed in the Bud Billiken Parade that day as Jesse White Tumblers.

---

[2] Chicago Defender Charities, Inc., *Bud Billiken® Parade*, https://www.budbillikenparade.org/.

29. Plaintiffs performed at several more engagements over the course of the same day.

30. At the end of the day's performances, Plaintiffs returned to the team's parking lot near Division Street and Orleans Street in Chicago.

31. Plaintiffs then drove away from that lot, headed home, in the car Rayquan Minor was driving. They had gone a short distance when Defendants curbed them.

32. All three Plaintiffs were still wearing their Jesse White Tumbling Team uniforms.

33. What Defendants stopped, ordered onto the street, and searched were three uniformed members of a Chicago youth program founded to keep Black children out of the criminal legal system, on their way home from performing in the largest Black parade in America.

***C. Plaintiffs were driving lawfully.***

34. On August 10, 2024, at about 8:10 p.m., Plaintiffs were riding together in a car near 343 West Goethe Street in Chicago.

35. Rayquan Minor was driving. Shadiya Minorwas in the front passenger seat. Semaj Sweezer was in the back seat.

36. Mr. Minor was driving lawfully. He was obeying the speed limit and every other rule of the road. He committed no traffic violation of any kind.

37. All three Plaintiffs were wearing their seat belts. Rayquan Minor was wearing his seat belt. Shadiya Minor was wearing her seat belt. Semaj Sweezer was wearing his seat belt.

38. Plaintiffs were not committing a crime, were not about to commit a crime, and had no contraband.

***D. Defendant Seng stopped the car for no lawful reason.***

39. Defendants Seng, Rodriguez, Vecchio, and Kittrell were patrolling together in a single Chicago Police Department vehicle. Defendant Seng was driving it.

40. Defendant Seng decided to pull Plaintiffs' car over, and did so.

41. Defendant Seng had no warrant, no reasonable articulable suspicion, and no probable cause to believe that any Plaintiff had committed or was about to commit any offense.

42. Defendants Rodriguez, Vecchio, and Kittrell joined in the stop and in the detention that followed. None of them had any lawful basis for it either.

43. Defendants could see, before and as they approached, that the occupants of the car were Black. They could also see that Plaintiffs were dressed in the uniform of a youth performance team.

***E. Plaintiffs complied completely, and within minutes Defendants ed both firearms were lawful.***

44. All three Plaintiffs gave the officers identification when asked.

45. Rayquan Minor told the officers, without being asked, that he held a valid Illinois FOID card and a valid Illinois Concealed Carry License, and that his firearm was in the car.

46. Defendant Kittrell returned to the police vehicle and ran a name check on Mr. Minor. Within about one minute of the beginning of the stop, Defendant Kittrell confirmed that his Concealed Carry License was valid.

47. Semaj Sweezer told Defendant Vecchio that he also held a valid Concealed Carry License and that his firearm was in the car.

48. Within about three minutes of the beginning of the stop, Defendant Vecchio confirmed that Mr. Sweezer's FOID card and Concealed Carry License were valid.

49. Both firearms were lawfully possessed and were stored inside closed personal backpacks in the back of the car.

50. Within roughly three minutes, therefore, each Defendant knew that no crime was afoot, that two of the three occupants were licensed firearm owners who had volunteered the

presence and location of their firearms, and that both licenses checked out. At that point the stop was over, and every Defendant knew it.

### *F. Defendants ordered Plaintiffs out of the car, and Defendant Kittrell searched Shadiya Minor's body.*

51. Defendants ordered all three Plaintiffs out of the car and onto the street.

52. After Shadiya Minor was ordered out of the car, Defendant Kittrell searched her body.

53. Defendant Kittrell ran her hands over Ms. Minor's outer clothing and then reached inside the pockets of the clothing Ms. Minor was wearing.

54. Ms. Minor had disclosed no weapon and had no weapon. She was not suspected of any crime. She made no threatening movement, no furtive movement, and no attempt to leave.

55. Defendant Kittrell had no reason to believe Ms. Minor was armed or dangerous, and therefore no basis to touch her at all. Defendant Kittrell had no probable cause to go inside her clothing.

56. Defendant Kittrell searched Ms. Minor in public, on a residential street, in view of neighbors and passersby.

57. Defendants Seng, Rodriguez, and Vecchio were present, saw Defendant Kittrell search Ms. Minor, and did nothing to stop it.

### *G. Defendants searched the car and Plaintiffs' closed backpacks.*

58. Defendant Kittrell searched the back seat of the car, including the closed personal backpacks belonging to Plaintiffs.

59. Defendant Rodriguez searched the car. Defendant Rodriguez also searched the personal belongings of Shadiya Minor and the personal belongings of Semaj Sweezer.

60. Defendant Vecchio searched the car and searched Plaintiffs' personal belongings, including reaching into Semaj Sweezer's backpack and removing his firearm from it.

61. No Defendant had a warrant. No Plaintiff consented. No Defendant had probable cause to believe the car or the bags contained evidence of any crime.

62. Lawful possession of a licensed firearm, voluntarily disclosed to the officers, is not a reason to search anything. Defendants treated it as one.

63. Defendant Seng, the supervisor on the scene, stood beside the car and watched each of these searches. He gave no order to stop them. He made no effort to intervene. He permitted them to continue and took part in them.

***H. Defendant Rodriguez handcuffed Semaj Sweezer and put the cuffs on tight.***

64. Defendant Rodriguez handcuffed Semaj Sweezer.

65. Defendant Rodriguez did so after Defendant Vecchio had already confirmed that Mr. Sweezer held a valid Concealed Carry License.

66. Mr. Sweezer was compliant throughout. He did not resist, did not flee, did not threaten anyone, and did not reach for anything. Four armed officers were present for three occupants. Mr. Sweezer posed no threat to Defendant Rodriguez or to anyone else.

67. There was no reason to handcuff Mr. Sweezer. He was handcuffed in public, on his own street, because he lawfully owned a firearm and told the police so.

68. Defendant Rodriguez applied the handcuffs tightly — more tightly than was necessary for any legitimate purpose — and left them that way for the duration of the detention.

69. The handcuffs caused Mr. Sweezer pain and physical discomfort in his wrists and hands.

70. Defendants Seng, Vecchio, and Kittrell were present, saw Defendant Rodriguez handcuff Mr. Sweezer, and did nothing to stop it.

### *I. Defendants left with nothing, and left no record.*

71. Defendants seized no contraband. Defendants recovered no illegal weapon. Defendants issued no ticket to any Plaintiff. Defendants made no arrest. Defendants charged no one with anything.

72. Defendants gave Plaintiffs no stop receipt and generated no report identifying who had stopped them, who had searched them, or why.

73. Defendants released Plaintiffs and left.

74. Plaintiffs did nothing to provoke or justify any part of what Defendants did to them.

75. As a direct and proximate result of Defendants' conduct, Plaintiffs suffered loss of liberty, unlawful invasion of their persons, vehicle, and personal effects, fear, humiliation, indignity, emotional distress, and harm to their standing in their own community.

76. Plaintiffs endured all of it in public, on a residential street, in the uniform of the youth performance team they had spent that day representing before the public.

77. Each individual Defendant acted intentionally, willfully, wantonly, maliciously, and with reckless and deliberate indifference to Plaintiffs' constitutional rights.

## THE CITY OF CHICAGO'S POLICIES, PRACTICES, AND CUSTOMS

### *A. CPD stops and searches Black drivers because they are Black.*

78. For at least a decade before August 10, 2024, the City of Chicago has operated a mass traffic stop program that targets Black drivers and the neighborhoods in which Black Chicagoans live.

79. The scale of that program grew explosively. CPD recorded approximately 85,000 traffic stops in 2015. It recorded 511,738 in 2022 and 535,088 in 2023.[3]

80. The burden of those stops falls on Black drivers. In 2023, CPD stopped Black drivers at 3.75 times the rate at which it stopped white drivers, and stopped Latino drivers at 2.73 times that rate. Black drivers accounted for approximately 51 percent of all CPD traffic stops that year, in a city whose population is approximately one-third Black. That share has increased overall from approximately 44 percent in 2004.[4]

81. The disparity is not explained by driving behavior. Peer-reviewed research published in the *Proceedings of the National Academy of Sciences* in 2024 compared officer-initiated stops against automated speed camera citations on the same Chicago streets, using mobile-phone data to estimate the actual racial composition of drivers on each road. Speed cameras, which cannot see race, ticketed Black drivers in rough proportion to their presence on the road. Officers did not. On a street where half the drivers were Black, Black drivers made up roughly 70 percent of police stops; where half the drivers were white, white drivers made up fewer than 20 percent of police stops.[5]

82. The disparity is also not explained by results. Statewide, more than 97 percent of all traffic stops of Black drivers produce no contraband at all, a rate that has remained flat for years. Black drivers are the least likely of any group to be stopped for a moving violation and the

---

[3] Ill. Dep't of Transp., *2023 Illinois Traffic Stop Study, Part I* (2024), https://idot.illinois.gov/content/dam/soi/en/web/idot/documents/transportation-system/reports/safety/traffic-stop-studies/2023%20Illinois%20Traffic%20Stop%20Study%20-%20Part%20I.pdf (reporting 511,738 Chicago Police Department traffic stops in 2022 and 535,088 in 2023; data reported pursuant to 625 ILCS 5/11-212).

[4] Ill. Dep't of Transp., *2023 Illinois Traffic Stop Study, Part I* (2024); WBEZ & Investigative Project on Race and Equity, *Chicago Police Traffic Stops, By the Numbers* (2024), https://interactive.wbez.org/traffic-stops/chicago-police/ (analyzing the complete Illinois Traffic Stop Study dataset, 2004–2023).

[5] Wenfei Xu, Michael Smart, Nebiyou Tilahun, Sajad Askari, Zachary Dennis, Houpu Li & David Levinson, *The Racial Composition of Road Users, Traffic Citations, and Police Stops*, 121 Proc. Nat'l Acad. Sci. U.S.A. e2402547121 (2024).

most likely to be stopped for a licensing or registration issue — the category of stop least connected to road safety and most useful as a pretext to investigate.[6]

83. Black and Latino motorists stopped by Illinois police are asked to consent to searches at substantially higher rates than white motorists, and yet contraband is found on white motorists at higher rates. Officers search Black drivers more and find less — the signature of a practice driven by race rather than by suspicion.[7]

84. Before Plaintiffs' stop, the City's chief executive had expressly acknowledged the longstanding and racially disparate nature of Chicago traffic enforcement. In a September 27, 2023 written statement concerning traffic-stop data, Mayor Brandon Johnson stated that Chicago had "a long history of disparities in Black and Brown communities, especially on the South and West sides." Mayor Johnson further acknowledged that residents of Black communities were being targeted for traffic stops at four times the rate of others.

85. The City therefore knew, well before August 10, 2024, that its traffic-stop practices disproportionately targeted Black Chicagoans.

86. The City has not stopped. It has continued the program, continued to reward stop volume, and continued to deploy tactical teams into Black neighborhoods to generate stops.

***B. The pattern in specific cases.***

87. The practice described above is not a statistical abstraction. It has been carried out in identifiable stops, on identifiable dates, by identifiable officers, including the Defendants in this case.

---

[6]Ill. Dep't of Transp., *2023 Illinois Traffic Stop Study, Part I* (2024).

[7]Ill. Dep't of Transp., *2023 Illinois Traffic Stop Study, Part I* (2024); ACLU of Ill., *Racism in the Rear View Mirror: Illinois Traffic Stop Data* (Jan. 2019).

88. In or about May 2023, Defendant Rodriguez stopped Jovan Streeter and Marquita Beecham without justification. During that stop, Defendant Rodriguez repeatedly and forcefully slammed Mr. Streeter's face into his car. Mr. Streeter and Ms. Beecham are Black.

89. In or about August 2023, Defendant Rodriguez stopped Mr. Streeter and Ms. Beecham a second time, again without justification, and threatened to shoot Ms. Beecham. The City's Bureau of Internal Affairs investigated that stop. The City suspended Defendant Rodriguez for three days.

90. On August 10, 2024, Defendants Seng, Rodriguez, Vecchio, and Kittrell stopped Plaintiffs at 343 West Goethe Street without justification, searched their car and their closed backpacks, searched the body of Shadiya Minor, handcuffed Semaj Sweezer, issued no citation, and generated no record.

91. On or about September 1, 2024 — twenty-one days after the stop of Plaintiffs, and less than one mile away, near Bellevue Place and Michigan Avenue — Defendants Rodriguez, Vecchio, and Kittrell stopped Limorris Bell, a Black man, and searched him and his car without justification. The City agreed that the search was improper and agreed to suspend Defendant Rodriguez for twenty days and Defendant Kittrell for seven days. Mr. Bell has sued the City.

92. The stop of Plaintiffs and the stop of Mr. Bell were carried out by three of the same officers, twenty-one days apart, within one mile of each other, in the same manner, against Black people, and with the same result: no citation, no charge, and no contraband.

93. The same practice operated in other districts at the same time. On or about March 1, 2024, officers assigned to the tactical team of CPD's Harrison (11th) District conducted a traffic stop in which they improperly detained and searched the driver, failed to document the stop

and the search, and failed to activate their body-worn cameras. The City later determined that suspensions were warranted.

94. On or about March 6, 2024, the same Harrison District tactical team conducted another traffic stop in which they improperly detained the driver, failed to provide the driver with a receipt documenting the search, and failed to document the stop. The City again determined that suspensions were warranted.

95. On or about March 21, 2024, that same Harrison District tactical team stopped Dexter Reed, a Black man, in a traffic stop, and shot and killed him. His estate has sued the City.

96. The plaintiffs in *Wilkins v. City of Chicago*, a certified challenge to the City's mass traffic stop program pending in this District, allege the same practice. Eric Wilkins, a Black man, was stopped three times in 2022, and none of those stops was documented in Department records. Mahari Bell, a Black man, was stopped at least ten times beginning in 2017, including three times in four days across three different police districts, and was never ticketed. Jacquez Beasley, a Black man, was stopped twelve times beginning in 2020 and was never ticketed. Three of the five *Wilkins* plaintiffs were stopped again in the twelve months after they filed suit.

97. These incidents share the features that define the practice: a Black driver, a claimed minor infraction or none at all, a search that is the actual object of the stop, no contraband, no citation, no arrest, and no documentation.

***C. CPD uses traffic stops as a pretext to search.***

98. The City maintains a widespread practice of using minor traffic infractions — real or invented — as a pretext to search vehicles, their contents, and their occupants for guns and drugs, without probable cause and without valid consent.

99. That is what happened to Plaintiffs. The traffic infraction was invented. The search was the point.

### *D. CPD conceals these stops by refusing to document them.*

100. The City maintains a widespread practice of failing to document traffic and investigatory stops — issuing no citation, no stop receipt, and no report — so that unlawful stops leave no record.

101. This is not a clerical problem. A stop with no paperwork produces no data for the statewide racial-profiling study, no entry for any early-intervention system, no notice to the person stopped of who stopped them or of the right to complain, and no artifact for a court or a monitor to examine.

102. Plaintiffs received nothing. Defendants generated nothing. The City has permitted its officers to make hundreds of thousands of stops this way.

### *E. The City knew these officers were violating the rights of Black drivers, and left them on the street.*

103. The City maintains a policy, practice, and custom of failing to meaningfully investigate, discipline, retrain, reassign, or remove officers who violate the constitutional rights of Chicago residents, with the result that CPD officers reasonably understand that they may violate those rights without consequence.

104. The individual Defendants were members of the tactical team of CPD's Near North (18th) District. That team compiled a documented pattern of improper and undocumented traffic stops of Black Chicagoans, concentrated in and around the North Michigan Avenue corridor and the surrounding North Side.[8]

1

106. The City eventually stripped five members of that tactical team of their police powers. It did not do so until long after the City had already been told, repeatedly, what these officers were doing — and long after August 10, 2024.

***The City's notice about Defendant Rodriguez, and its refusal to act on it.***

107. Well before August 10, 2024, the City knew that Defendant Rodriguez was repeatedly stopping and searching Black Chicagoans without justification.

108. Complaints against Defendant Rodriguez had been sustained on multiple occasions, including one arising from an improper search of a pedestrian following an investigatory stop.[9]

109. Between May and August of 2023, Defendant Rodriguez Jr pulled Jovan Streeter and Marquita Beecham, over twice without justification. He also slammed Mr. Streeter's face into his car during the first stop, and threatened to shoot Ms. Beecham during the second.

110. The City suspended Defendant Rodriguez for three days.

111. A three-day suspension for that conduct is not discipline. It is permission.

112. The City returned Defendant Rodriguez to the same tactical team, to the same district, and to the same discretionary traffic-stop activity, with the same partners.

113. On August 10, 2024, Defendant Rodriguez searched Plaintiffs' car, searched the personal belongings of Shadiya Minor and Semaj Sweezer, and handcuffed Mr. Sweezer, all without justification.

***The City let it happen again three weeks later.***

114. Twenty-one days after Defendants stopped and searched Plaintiffs, and less than a mile away, Defendants Rodriguez, Vecchio, and Kittrell stopped another Black man and improperly searched him and his car.

115. The City later agreed that this second stop was improper and agreed to suspend Defendant Rodriguez for twenty days and Defendant Kittrell for seven days in connection with it. That man has sued the City.

116. The sequence establishes causation directly. The City's failure to discipline Defendant Rodriguez for what he had already been found to have done did not merely fail to protect Plaintiffs on August 10, 2024. It failed to stop him from doing the same thing to someone else three weeks later.

117. Defendant Rodriguez went on to face more than two dozen additional complaints and to be named in at least eight pending lawsuits. The City did not strip him of his police powers until February 2026 — roughly eighteen months after he searched Plaintiffs — and did so then in the middle of a court-ordered deposition in a civil rights case against him.

***The same pattern for the other Defendants.***

118. At least twelve complaints against Defendant Seng have been sustained, carrying recommended suspensions totaling approximately ninety-one days. Additional sustained complaints against him remain, with discipline still unassigned. In January 2026 the City agreed to suspend Defendant Seng for fifteen days for a separate traffic stop that violated another driver's constitutional rights. Throughout, the City kept him in a supervisory rank overseeing tactical officers making discretionary stops.[10]

119. Defendant Kittrell was disciplined for the stop of Plaintiffs and for the stop twenty-one days later. When an eleven-day suspension was recommended for her conduct during the stop of Plaintiffs, the City objected and negotiated the penalty down to seven days. She remains assigned to the 18th District.

120. Defendant Vecchio was likewise disciplined for the stop of Plaintiffs and for the stop twenty-one days later.

***The City discounts, delays, and does not deter.***

121. This is how the City responds to sustained findings that its officers violated the Constitution: it negotiates the penalty down, imposes suspensions measured in single-digit days, permits years of appeals, leaves discipline unassigned in case after case, and returns the officer to the same assignment in the meantime.

122. Officers understand what that means. An officer who has been found to have violated the Constitution a dozen times, and who has lost a handful of days of pay for it, has been taught that the constitutional rights of Black Chicagoans are a scheduling inconvenience.

123. The City's failure extended to its oversight apparatus itself. Leaders of the City's Community Commission for Public Safety and Accountability formally found that the City's civilian police oversight agency had failed to raise the alarm about the very pattern of improper traffic stops at issue here, and that this failure may have exposed Chicago residents to greater risk of harm and squandered the opportunity to address a frequent source of complaints.

124. The City's failure to discipline, retrain, reassign, or remove these Defendants — and its ratification of their conduct by returning them to duty again and again — was a moving

force behind and a proximate cause of what Defendants did to Plaintiffs on August 10, 2024.

### *F. Code of silence.*

125. The City maintains a widespread custom, known as the code of silence, under which CPD officers do not report and affirmatively conceal one another's misconduct, and give false or incomplete accounts to investigators. The existence of this custom was established by jury verdict in *Obrycka v. City of Chicago*, No. 07 C 2372 (N.D. Ill.), was confirmed by the Department of Justice in 2017, and has been acknowledged by the City's own officials.[11]

126. This case shows it in operation. Four officers watched one another violate the rights of three people. Not one intervened. Not one reported it. Not one wrote it down.

### *G. The City does not require its officers to intervene, and does not discipline them when they fail to.*

127. The City maintains a widespread practice under which CPD officers who witness a fellow officer violating a person's constitutional rights do not intervene to stop it, do not report it, and do not document it.

128. The City does not train its officers that they have an affirmative duty to intervene when a fellow officer is conducting an unlawful stop, an unlawful search, or an unlawful seizure, and does not train its supervisors that they are obligated to stop unlawful conduct by the officers they command.

---

[11] *Obrycka v. City of Chicago*, No. 1:07-cv-02372 (N.D. Ill.); U.S. Dep't of Justice, Civil Rights Div. & U.S. Att'y's Office, N.D. Ill., *Investigation of the Chicago Police Department* (Jan. 13, 2017).

129. The City does not meaningfully discipline officers who stand by while a fellow officer violates the Constitution. A CPD officer who watches an unlawful search and says nothing faces no realistic prospect of consequence.

130. The predictable result is what happened to Plaintiffs. Four Chicago police officers, including a sergeant, stood on a public street and watched one another stop three people without cause, search their car, open their bags, search a woman's body, and handcuff a licensed gun owner. Not one of the four intervened. Not one reported it. Not one wrote it down.

131. The City's failure to train, require, and enforce the duty to intervene was a moving force behind and a proximate cause of the violations of Plaintiffs' rights.

***H. Failure to train and supervise.***

132. The City failed to adequately train its officers on the limits of the automobile exception, the requirement of probable cause, the constitutional limits of a protective frisk under *Terry v. Ohio*, 392 U.S. 1 (1968), the constitutional limits on handcuffing during an investigative stop and on the force used to apply handcuffs, the treatment of lawful concealed-carry licensees, and the prohibition on race-based enforcement.

133. The City failed to adequately train and supervise its supervisory personnel on their duty to direct subordinates toward lawful conduct, to intervene in and halt unlawful conduct as it is occurring, and to ensure that stops are documented.

134. The need for this training and supervision was obvious, and the City was told so repeatedly. Its failure to act was deliberately indifferent to the constitutional rights of Chicago residents, including Plaintiffs.

135. The policies, practices, and customs described above, individually and together, were the moving force behind and the direct and proximate cause of the violations of Plaintiffs' rights alleged below.

## COUNT I — 42 U.S.C. § 1983
## Unlawful Stop — Fourth Amendment

*(All Plaintiffs against Defendants Seng, Rodriguez, Vecchio, and Kittrell)*

136. Plaintiffs reallege the foregoing paragraphs.

137. Defendant Seng drove the police vehicle, decided to curb Plaintiffs' car, and executed the stop. He seized all three Plaintiffs.

138. Defendant Rodriguez approached the stopped car, took Plaintiffs' identification, and remained on the scene continuing the detention of all three Plaintiffs.

139. Defendant Vecchio approached the stopped car, took identification and information from Plaintiff Sweezer, and remained on the scene continuing the detention of all three Plaintiffs.

140. Defendant Kittrell approached the stopped car, took Plaintiff Minor's identification back to the police vehicle to run a name check, and remained on the scene continuing the detention of all three Plaintiffs.

141. Each of these Defendants participated in seizing Plaintiffs, and each continued that seizure after it began.

142. No Plaintiff committed any traffic violation. Neither Defendant Seng, nor Defendant Rodriguez, nor Defendant Vecchio, nor Defendant Kittrell had a warrant, probable cause, or reasonable articulable suspicion that any Plaintiff had violated any law.

143. The stop was unreasonable and violated the Fourth Amendment.

144. Each Defendant's conduct proximately caused Plaintiffs' injuries.

## COUNT II — 42 U.S.C. § 1983

### Racially Selective Enforcement — Equal Protection Clause of the Fourteenth Amendment

*(All Plaintiffs against Defendants Seng, Rodriguez, Vecchio, and Kittrell)*

145. Plaintiffs reallege the foregoing paragraphs.

146. Plaintiffs are Black and are members of a protected class.

147. Each Defendant could see that the occupants of the car were Black before and as he or she approached it.

148. Each Defendant could also see that Plaintiffs were dressed in the uniform of a youth performance team.

149. Defendant Seng curbed Plaintiffs' car, and permitted the searches that followed, because Plaintiffs are Black.

150. Defendant Rodriguez searched Plaintiffs' car, searched the personal belongings of Ms. minor and Mr. Sweezer, and handcuffed Mr. Sweezer, because Plaintiffs are Black.

151. Defendant Vecchio searched Plaintiffs' car and searched Plaintiffs' personal belongings because Plaintiffs are Black.

152. Defendant Kittrell searched the back seat and Plaintiffs' closed backpacks, and searched the body of Ms. Minor, because Plaintiffs are Black.

153. Similarly situated white motorists are not stopped on false pretenses, ordered out of their cars, searched along with their closed bags, patted down and searched inside their clothing, or handcuffed after producing a valid concealed carry license. Defendants would not have treated a car of white occupants this way, and the City's own stop data demonstrates that CPD does not.

154. No lawful justification for the stop existed. Where no legitimate basis for a stop exists, and the occupants of the stopped vehicle are Black, the inference of discriminatory purpose follows directly.

155. Nothing about Plaintiffs suggested criminality. Three uniformed Jesse White Tumblers, driving home from the Bud Billiken Parade, were curbed, ordered onto the street, and searched along with their bags. What set them apart from the motorists CPD does not treat this way is that they are Black.

156. Defendants acted with discriminatory intent and purpose, and their conduct had a discriminatory effect on Plaintiffs.

157. Defendants' conduct deprived Plaintiffs of the equal protection of the laws guaranteed by the Fourteenth Amendment.

158. Each Defendant's conduct proximately caused Plaintiffs' injuries.

**COUNT III — 42 U.S.C. § 1983**

**Unlawful Search of the Vehicle — Fourth Amendment**

*(All Plaintiffs against Defendants Rodriguez, Vecchio, Kittrell, and Seng)*

159. Plaintiffs reallege the foregoing paragraphs.

160. Defendant Kittrell searched the interior of Plaintiffs' vehicle, including the back seat.

161. Defendant Rodriguez searched the interior of Plaintiffs' vehicle.

162. Defendant Vecchio searched the interior of Plaintiffs' vehicle.

163. Defendant Seng, the ranking officer present, ordered and permitted each of those searches, failed to stop any of them, and was an active participant in them.

164. Neither Defendant Kittrell, nor Defendant Rodriguez, nor Defendant Vecchio, nor Defendant Seng had a warrant, consent, probable cause, or any applicable exception to the warrant requirement.

165. The search of the vehicle was unreasonable and violated the Fourth Amendment.

166. Each Defendant's conduct proximately caused Plaintiffs' injuries.

**COUNT IV — 42 U.S.C. § 1983**

**Unlawful Search of Personal Effects — Fourth Amendment**

*(All Plaintiffs against Defendants Kittrell, Rodriguez, Vecchio, and Seng)*

167. Plaintiffs reallege the foregoing paragraphs.

168. Plaintiffs had a reasonable expectation of privacy in their closed personal backpacks and in the contents of those bags.

169. Defendant Kittrell opened and searched the closed personal backpacks located in the back seat of the vehicle.

170. Defendant Rodriguez searched the personal belongings of Plaintiff Shadiya Minor and the personal belongings of Plaintiff Semaj Sweezer.

171. Defendant Vecchio searched Plaintiffs' personal belongings and reached inside Plaintiff Sweezer's backpack.

172. Defendant Seng, the ranking officer present, ordered and permitted each of those searches, failed to stop any of them, and was an active participant in them.

173. None of these four Defendants had a warrant, consent, or probable cause. Because no Defendant had probable cause to search the car, no Defendant had authority to search the occupants' belongings inside it.

174. The searches of Plaintiffs' personal effects were unreasonable and violated the Fourth Amendment.

175. Each Defendant's conduct proximately caused Plaintiffs' injuries.

**COUNT V — 42 U.S.C. § 1983**
**Unlawful Search of the Person — Fourth Amendment**
*(Plaintiff Shadiya Minor against Defendant Kittrell)*

176. Plaintiff Shadiya Minor realleges the foregoing paragraphs.

177. Defendant Kittrell searched Ms. Minor's body and reached inside the pockets of her clothing.

178. Defendant Kittrell had no reasonable suspicion that Ms. Minor was armed and dangerous, and therefore no basis even for a protective frisk of outer clothing.

179. Reaching inside Ms. Minor's clothing exceeded the scope of any permissible frisk and required probable cause, which Defendant Kittrell did not have.

180. The search of Ms. Minor's person was unreasonable and violated the Fourth Amendment.

**COUNT VI — 42 U.S.C. § 1983**
**Unlawful Seizure and Excessive Force — Fourth Amendment**
*(Plaintiff Semaj Sweezer against Defendant Rodriguez)*

182. Plaintiff Semaj Sweezer realleges the foregoing paragraphs.

183. Defendant Rodriguez handcuffed Mr. Sweezer, thereby seizing him and using force against him.

184. Handcuffing during an investigative stop is permissible only where it is necessary to effectuate the stop or to protect officer safety. Neither justification existed. Mr. Sweezer was compliant, outnumbered four to one, and had already been confirmed by Defendant Vecchio as a lawful licensee.

185. Independently, the manner in which Defendant Rodriguez applied the handcuffs was objectively unreasonable. He tightened them beyond what any legitimate purpose required and left them that way, causing Mr. Sweezer pain and discomfort in his wrists and hands.

186. Because Mr. Sweezer posed no threat, was suspected of no crime, and had already been confirmed as a lawful licensee, no degree of force was reasonable, and the tightness of the restraint compounded an application of force that should never have occurred at all.

187. The seizure and the force used were unreasonable and violated the Fourth Amendment.

188. Defendant Rodriguez's conduct proximately caused Mr. Sweezer's injuries.

**COUNT VII — 42 U.S.C. § 1983**
**Failure to Intervene**
*(All Plaintiffs against Defendants Seng, Rodriguez, Vecchio, and Kittrell)*

189. Plaintiffs reallege the foregoing paragraphs.

190. Defendant Seng watched the stop, the search of the car, the search of the closed backpacks, the search of Ms. Minor's  person, and the handcuffing of Mr. Sweezer. As the ranking supervisor on the scene he had both the authority and the duty to stop all of it. He had a realistic opportunity to do so and did not.

191. Defendant Rodriguez saw Defendant Kittrell search Ms. Mino's person and saw the unlawful searches of the car and the bags. He had a realistic opportunity to intervene and did not.

192. Defendant Vecchio saw Defendant Kittrell search Ms. Minor's person and saw Defendant Rodriguez handcuff Mr. Sweezer. He had a realistic opportunity to intervene and did not.

193. Defendant Kittrell saw Defendant Rodriguez handcuff Mr. Sweezer and saw the unlawful searches of the car and the bags. She had a realistic opportunity to intervene and did not.

194. Each Defendant's failure to intervene proximately caused Plaintiffs' injuries.

**COUNT VIII — 42 U.S.C. § 1983**

**Monell Claim — Unconstitutional Policies, Practices, and Customs**

*(All Plaintiffs against Defendant City of Chicago)*

195. Plaintiffs reallege the foregoing paragraphs.

196. At all relevant times the City of Chicago maintained the following policies, practices, and customs, each so persistent and widespread as to carry the force of law: (a) stopping Black drivers without lawful justification; (b) using minor or invented traffic infractions as a pretext to search vehicles, their contents, and their occupants without probable cause; (c) leaving such stops undocumented, by issuing no citation, no stop receipt, and no report, so that they escape review; (d) failing to investigate, discipline, retrain, reassign, or remove officers who violate constitutional rights; (e) failing to train officers on their affirmative duty to intervene, and failing to discipline officers who watch a fellow officer violate the Constitution and do nothing; and (f) failing to train and supervise officers and supervisors on the constitutional limits of stops, searches, and the use of handcuffs.

197. Each of these practices is established by the specific incidents alleged above, as follows.

198. The two stops of Jovan Streeter and Marquita Beecham by Defendant Rodriguez in May and August of 2023 establish practices (a), (b), and (d): two Black motorists stopped without justification, subjected to force, and a three-day suspension in response.

199. The stop of Plaintiffs on August 10, 2024 establishes practices (a) through (f): three Black Chicagoans stopped without cause, searched without probable cause, with no officer intervening, no citation issued, and no record made.

200. The stop and search of Limorris Bell by Defendants Rodriguez, Vecchio, and Kittrell on or about September 1, 2024 establishes practices (a), (b), and (d): a Black motorist stopped

and searched without justification by three of the same officers, twenty-one days after they did the same thing to Plaintiffs and less than a mile away.

201. The Harrison District tactical team stops of March 1 and March 6, 2024 establish practices in which drivers were improperly detained and searched, stops left undocumented, receipts

204. Each of these practices is further established by the City's own reported data, which shows hundreds of thousands of traffic stops each year, concentrated on Black drivers at four to seven times the rate of white drivers, producing citations, arrests, and contraband in a vanishingly small fraction of cases.

205. Defendants Seng, Rodriguez, Vecchio, and Kittrell did not act on a frolic of their own. They did on August 10, 2024 precisely what the City's practices called for and permitted: they stopped a car of Black Chicagoans without cause, treated the stop as an opportunity to search, searched without probable cause, declined to intervene in one another's conduct, and wrote nothing down. Each element of what they did to Plaintiffs corresponds to an element of the practices described above.

206. Had the City not maintained these practices — had it required cause for stops, prohibited pretextual searches, enforced its own documentation rules, trained its officers to intervene, and disciplined those who did not — Defendants would not have stopped Plaintiffs, would not have searched them, and would not have handcuffed Mr. Sweezer.

207. The City's policies, practices, and customs were therefore the moving force behind, and the direct and proximate cause of, each violation of Plaintiffs' rights alleged in Counts I through VII.

208. These policies, practices, and customs were maintained with the knowledge and deliberate indifference of the City's final policymakers, who were on actual notice of them from the

January 2017 findings of the United States Department of Justice, the consent decree entered in *Illinois v. City of Chicago*, No. 17-cv-6260 (N.D. Ill.), the reports of the independent monitor appointed under that decree, the annual Illinois Traffic and Pedestrian Stop Statistical Study Act reports, the findings of the City's own Police Accountability Task Force.

**COUNT IX — 42 U.S.C. § 1983**
**Monell Claim — Failure to Discipline, Supervise, and Remove**
*(All Plaintiffs against Defendant City of Chicago)*

209. Plaintiffs reallege the foregoing paragraphs.

210. Before August 10, 2024, the City of Chicago had actual knowledge that each of the individual Defendants was stopping, detaining, and searching Black Chicagoans without lawful justification, and was failing to document those stops.

211. As to Defendant Rodriguez: the City knew, through its own Bureau of Internal Affairs, that he had stopped Jovan Streeter and Marquita Beecham twice in 2023 without justification, had slammed Mr. Streeter's face into a car, and had threatened to shoot Ms. Beecham. The City knew that complaints against him had been sustained on multiple prior occasions, including one arising from an improper search of a pedestrian following an investigatory stop, which the City's own records describe as involving substantial prior findings of misconduct. The City imposed a three-day suspension and returned him to the same tactical team, the same district, and the same discretionary traffic-stop duty.

212. As to Defendant Seng: the City knew that he held supervisory rank and that at least twelve complaints against him had been sustained, carrying recommended suspensions totaling approximately ninety-one days, with additional sustained complaints left without assigned

discipline. The City left him in a supervisory rank commanding tactical officers making discretionary stops.

213. As to Defendant Vecchio: the City knew that numerous complaints against him had been sustained arising from stops and searches, and left him assigned to the same tactical team as Defendant Rodriguez.

214. As to Defendant Kittrell: the City knew that complaints against her had been sustained, and left her assigned to the same tactical team as Defendants Rodriguez and Vecchio, working the same discretionary stop activity.

215. The City had the authority and the obligation to act on that knowledge. It could have imposed discipline proportionate to the conduct. It could have retrained these officers. It could have separated them from one another. It could have removed them from tactical assignment. It could have stripped their police powers, as it eventually did.

216. The City did none of those things before August 10, 2024. Instead it imposed penalties measured in single-digit days, negotiated recommended suspensions downward, left sustained findings without assigned discipline for years, and returned these Defendants to the same district, the same team, and the same work.

217. *Causation as to Defendant Rodriguez.* Had the City imposed meaningful discipline, retraining, reassignment, or removal after the Streeter and Beecham stops, Defendant Rodriguez would not have been on the street in the 18th District tactical team on August 10, 2024, and would not have searched Plaintiffs' car, searched the belongings of Ms. Minor and Mr. Sweezer, or handcuffed Mr. Sweezer.

218. The proof of that causal link is not speculative. Twenty-one days after Defendant Rodriguez did these things to Plaintiffs, he did the same thing to Limorris Bell, less than a

mile away, with two of the same officers. The City's failure to act did not merely fail to protect Plaintiffs. It failed to stop the same officer from repeating the same conduct three weeks later.

219. *Causation as to Defendant Seng.* Had the City acted on the twelve sustained complaints against Defendant Seng, or removed him from supervisory rank, he would not have been the sergeant who curbed Plaintiffs' car and then stood by while his subordinates searched it.

220. *Causation as to Defendants Vecchio and Kittrell.* Had the City separated this tactical team, retrained its members, or disciplined them meaningfully, Defendants Vecchio and Kittrell would not have been riding in Defendant Seng's squad car on August 10, 2024, and would not have searched Plaintiffs' vehicle, opened their backpacks, or searched Ms. Minor's body.

221. The City's conduct amounted to ratification of these Defendants' misconduct and communicated to them, and to CPD officers generally, that stopping and searching Black Chicagoans without justification carries no meaningful consequence.

222. The City's failure to discipline, supervise, retrain, reassign, and remove these Defendants was deliberately indifferent, was the moving force behind, and was a direct and proximate cause of the violations of Plaintiffs' rights alleged in Counts I through VII.

## COUNT X — ILLINOIS CIVIL RIGHTS ACT OF 2003
## 740 ILCS 23/5

*(All Plaintiffs against Defendant City of Chicago)*

223. Plaintiffs reallege the foregoing paragraphs.

224. The Illinois Civil Rights Act of 2003 prohibits a unit of state or local government from subjecting a person to discrimination on the basis of race, and from utilizing criteria or

methods of administration that have the effect of subjecting individuals to discrimination because of race. 740 ILCS 23/5(a).

225. The City of Chicago is a unit of local government subject to the Act.

226. Through its mass traffic stop program and its related search practices, the City has utilized criteria and methods of administration that have the effect of subjecting Black Chicagoans, including Plaintiffs, to discrimination because of their race.

227. The City's practices are not justified by any legitimate, non-discriminatory objective, and any asserted objective could be served by less discriminatory means. The stops overwhelmingly produce no citation, no arrest, and no contraband.

228. Plaintiffs were injured by these practices and are entitled to relief under 740 ILCS 23/5(b), including damages, injunctive relief, and reasonable attorney's fees and costs.

## COUNT XI — ILLINOIS STATE LAW

### Battery

*(Plaintiff Shadiya Minor against Defendant Kittrell; Plaintiff Semaj Sweezer against Defendant Rodriguez)*

229. Plaintiffs Shadiya Minor and Semaj Sweezer reallege the foregoing paragraphs.

230. Defendant Kittrell intentionally made harmful and offensive contact with Shadiya Minor's body, including by reaching inside her clothing, without consent and without legal justification.

231. Defendant Rodriguez intentionally made harmful and offensive contact with Semaj Sweezer by handcuffing him and by applying the handcuffs tightly, without consent and without legal justification.

232. Both Defendants acted willfully and wantonly. Neither had any privilege for the contact.

233. Their conduct proximately caused these Plaintiffs' injuries.

## COUNT XII — ILLINOIS STATE LAW
### Respondeat Superior
*(All Plaintiffs against Defendant City of Chicago)*

234. Plaintiffs reallege the foregoing paragraphs.

235. Defendants Kittrell and Rodriguez committed the state-law torts alleged above while acting within the scope of their employment by the City of Chicago.

236. The City is liable as principal for those torts.

## COUNT XIII — 745 ILCS 10/9-102
### Indemnification
*(All Plaintiffs against Defendant City of Chicago)*

237. Plaintiffs reallege the foregoing paragraphs.

238. Illinois law directs a local public entity to pay any tort judgment for compensatory damages for which its employee is liable within the scope of employment. 745 ILCS 10/9-102.

239. The City must therefore pay any compensatory judgment entered against Defendants Seng, Rodriguez, Vecchio, and Kittrell.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants and award:

a. compensatory damages in an amount to be determined at trial;

b. punitive damages against Defendants Seng, Rodriguez, Vecchio, and Kittrell;

c. attorney's fees and costs under 42 U.S.C. § 1988 and 740 ILCS 23/5(c);

d. pre- and post-judgment interest;

e. injunctive relief under the Illinois Civil Rights Act;

f. indemnification by the City of Chicago under 745 ILCS 10/9-102; and

g. any other relief this Court deems just.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated: July 30, 2026

Respectfully submitted,

**/s/ Hakeem Muhammad**
Hakeem Muhammad
MUHAMMAD LAW CENTER
332 South Michigan Avenue
Suite 121, No. 5379
Chicago, Illinois 60604
Telephone: (504) 400-9598
Email: hakeem@muhammadlawcenter.com
ARDC No. 6343978

*Counsel for Plaintiffs*